IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

**UNITED STATES OF AMERICA,**

         **Plaintiff,**

Case 2:13-cr-20330-JTF

v.

**AMOS PATTON**

         **Defendant.**

---

**REPORT AND RECOMMENDATION ON
DEFENDANT'S MOTION TO SUPPRESS**

---

Before the Court is Defendant Amos Patton's Motion to Suppress. (Docket Entry "D.E." #29).[1] The instant motion has been referred to the United States Magistrate Judge for Report and Recommendation. (D.E. #42). For the reasons set forth herein, it is recommended that Defendant's Motion to Suppress be DENIED.

**I. Proposed Findings of Fact**

Federal Bureau of Investigation ("FBI") Special Agent for the Memphis Division, Conrad Straube ("Agent Straube"), employed as such since March 2010 and currently assigned to the Violent Crimes Squad,[2] testified that on October 24, 2013, he was "dispatched to the base out in Millington for a shooting that had taken place." (January 31, 2014 Hearing Tr. ("Tr.") at 7). Upon

---

[1] Defendant's Motion to Suppress sought suppression of "the statements he allegedly made on October 25, 2013 without the benefit of counsel and in response to questioning by law enforcement officers." (Mot. to Suppress at 1).

[2] Agent Straube is also a certified crisis negotiator for the FBI. (Tr. at 35).

1

learning that a suspect had been apprehended in connection with the shooting, Agent Straube "was dispatched from the scene and made [his] way to the Millington Police Department to meet that person" who was then identified as Amos Patton (Tr. at 8–9). Agent Straube joined Shawn Nash from Naval Command Investigative Services ("NCIS") and Dave McIntosh, also with the FBI Violent Crimes Squad, in a room to "interview Mr. Patton." (Tr. 8–9). Agents Nash and McIntosh then advised Defendant of his *Miranda* rights by reading them "aloud," but "he was also offered the opportunity to review the forms." (Tr. at 10). According to Agent Straube, "[o]ne form was the FBI Advice of Rights Form. The second is one that belonged to the NCIS, their Advice of Rights Form" which he understood to be a military form. (Tr. at 9). Defendant "indicated that he did not want to talk about the investigation" and "indicated that he wanted to talk to an attorney beforehand." (Tr. at 10). Agent Straube then testified that on "NCIS's form, Military Suspect's Acknowledgment and Waiver of Rights," Defendant "wrote on the bottom, I want to retain a lawyer." (Tr. at 11; January 31, 2014 Hrg., Exh. 1). On the "FD-395 Advice of Rights Form" used by the FBI, "in the signature mark he marked refused, meaning that he did not wish to sign or talk to us." (Tr. at 12–13; January 31, 2014 Hrg., Exh. 2). Subsequent to this, Defendant was asked some biographical questions, including his wife's name, children's name, their ages, his employment status, his educational level, and where he attended church. (Tr. at 13–14). Agent Straube indicated that following Defendant's assertion of his *Miranda* rights, the agents did not ask him any more questions about the case, "nothing at all." (Tr. at 15).

The next morning, on October 25, 2013, Agent Straube was "asked to take Mr. Patton from the Millington Police Station and to take him to be processed at the FBI office and to have him here at Federal Court for his initial appearance." (Tr. at 16). Agent Straube and Task Force Officer Jason

Bartlett, a Shelby County Sheriff's Deputy, took custody of Defendant and placed him in their vehicle "with the prisoner up front" because it was "not your typical police car where there's a cage and you can sit a prisoner in the back for safe transport." (Tr. at 18). As they were getting into the car, Agent Straube explained to Defendant that the charges he faced "were reflective of people being injured but that nobody was killed at the scene" and "that was explained to him at the jail, and then the car ride began." (Tr. at 32–33). Agent Straube testified that as they drove he and Officer Bartlett were engaged in casual conversation and "it was really quiet with Mr. Patton for quite a while." (Tr. at 20). Defendant became involved "when the conversation turned to running." (Tr. at 30).[3] Agent Straube stated that "eventually [Defendant] made some statements and talked a little bit about physical fitness" and "he started talking about his education." (Tr. at 20, 30–31). Agent Straube testified that Defendant told them "he had been invited to participate in some special type of running event in Washington, D.C." and "made some comments pertaining to now that's over with." (Tr. at 21).

Agent Straube testified further that at one point they "did almost have a car accident" when a deer ran in front of a semi-truck and that it was "Mr. Patton himself who yelled out for me to slow down or to stop, and we avoided the deer." (Tr. at 22). As they proceeded along, Agent Straube noticed Defendant start to cry and breathe heavier. (Tr. at 23, 30–31). It was at this time that Defendant made the statement, "Claims made by another woman a year ago. New commander. You don't know me. My superiors didn't stand up for me. What was I supposed to do? I just blew up." (Tr. at 23). Agent Straube averred that the only other conversations he had with Defendant in the

---

[3] Neither Officer Bartlett nor Defendant testified at the suppression hearing regarding the conversations that took place in the police car.

3

squad car were "incidental" and involved asking whether he was alright, whether he would like a bottle of water, and whether he wanted something to eat before they arrived at the FBI office. (Tr. at 19, 24–25).

## II. Proposed Conclusions of Law

It is undisputed that following Defendant's arrest on October 24, 2013, police officers read Defendant his *Miranda* rights which he declined to waive thereafter. It is also undisputed that Defendant asserted his right to counsel by requesting an attorney in writing on the form presented to him at the police station that same day. The parties dispute, however, whether the statements made by Defendant while in police custody and during transport on October 25, 2013 were spontaneous utterances or the product of custodial interrogation for which Fifth Amendment protections would apply.

The Fifth Amendment guarantees that no person "shall be compelled in any criminal case to be a witness against himself…" U.S. Const. amend. V. It is well-known that in *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), the Supreme Court proposed certain "procedural safeguards effective to secure the privilege against self-incrimination." Among these were the now widely recognized *Miranda* warnings that the defendant be informed "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires"—or something comparable. *Id.* at 479. If the accused indicates that he wishes to remain silent, "the interrogation must cease." *Edwards v. Arizona*, 451 U.S. 477 (1981) (quoting *Miranda*, 384 U.S. at 474). If he requests counsel, "the interrogation must cease until an attorney is present." *Id.*

"The *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980). The functional equivalent of express questioning is defined as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police *should know* are reasonably likely to elicit an incriminating response from the suspect." *Pennsylvania v. Muniz*, 496 U.S. 582, 600–01 (emphasis supplied). On the other hand, the Fifth Amendment does not prohibit all incriminating admissions; "[absent] some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions." *New York v. Quarles*, 467 U.S. 649, 654 (1984) (quoting *United States v. Washington*, 431 U.S. 181, 187 (1977)). Statements made freely and voluntary, without compulsion, are not barred by the Fifth Amendment and are admissible in evidence. *Miranda*, 384 U.S. at 478.

Turning now to the instant case, the Court finds that Defendant was not subjected to custodial interrogation. To begin with, the evidence presented does not support a finding that the officers subjected Defendant to any express questioning. As Agent Straube's testimony makes clear, the questions directed towards Defendant on October 25 were purely "incidental" to the car ride. That is, Agent Straube offered Defendant bottled water along the way and asked if he would like anything to eat before they arrived at the FBI office per custom. While Officer Bartlett did not testify at the suppression hearing, the record does not indicate that he subjected Defendant to questioning any more than Agent Straube and certainly not questioning which would rise to a level so as to suggest an interrogation. In the absence of express questioning, it must be decided whether the officers engaged in its functional equivalent.

Defendant maintains that Agent Straube's statements on October 25 as to the condition of

the victims, relayed to him in the context of explaining what charges he faced, were the kind of statements he should have known were reasonably likely to elicit an incriminating response. They were not. *See United States v. Conley*, 156 F.3d 78, 83 (1st Cir. 1998) (holding that "a law enforcement officer's mere description of evidence and of potential charges against a suspect . . . hardly can be classified as interrogatory." *See also United States v. Orr*, 636 F.3d 944 (8th Cir. 2011); *United States v. Wipf*, 397 F.3d 677 (8th Cir. 2005). Notwithstanding the fact that Agent Straube's statements were not reasonably likely to elicit an incriminating response from Defendant, and indeed invited no response whatsoever, such statements were made "to him at the jail, and then the car ride began." Defendant's statements for which he seeks suppression were made well into the approximately twenty-five minute trip[4] and even after Defendant had engaged in other casual conversation with Agent Straube and Officer Bartlett. Based on these facts, it is apparent that the statements Defendant made during the course of his transfer were spontaneous admissions, uncoerced by either express questioning or its functional equivalent. Furthermore, *Edwards*, 451 U.S. 477, does not bar the introduction into evidence of spontaneous utterances merely because the utterances occur subsequent to the accused's invocation of his right to counsel[5]. *Conley*, 156 F.3d

---

[4] Agent Straube testified as to the route taken and estimated the car ride lasted twenty-five minutes. (Tr. at 36–37).

[5] Defendant argues there is both a Fifth Amendment and a Sixth Amendment violation. (Tr. at 38). Court records indicate the Criminal Complaint was filed on October 25, 2013. Defendant's statements were also made on October 25, 2013. While it is unclear as to which occurred first for purposes of determining exactly when the Sixth Amendment right to counsel attached, and even assuming *arguendo* that Defendant's statements were made subsequent to the initiation of a proceeding against him, Defendant's Sixth Amendment claim fails. *See United States v. Henry*, 447 U.S. 264, 276 (1980) (stating that while *Massiah v. United States*, 377 U.S. 201 (1964), held that "the Government violated the Sixth Amendment when it deliberately elicited incriminating information from an indicted defendant," that ruling "does not prohibit the introduction of spontaneous statements that are not elicited by governmental action.") In any

at 83 (citing *Shedelbower v. Estelle*, 885 F.2d 570, 573–74 (9th Cir. 1989); *United States v. De La Luz Gallegos*, 738 F.2d 378, 371 (10th Cir. 1984)).  Accordingly, Defendant's voluntary statements cannot form the basis of a *Miranda* violation and therefore should not be suppressed.

## III. Conclusion

For the reasons set forth herein, it is recommended that Defendant's Motion to Suppress be DENIED.

**DATED** this 21st day of February, 2014.

s/ Charmiane G. Claxton  
CHARMIANE G. CLAXTON  
UNITED STATES MAGISTRATE JUDGE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT.  28 U.S.C. § 636(b)(1)(C).  FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**

---

event, the Court concludes Defendant was not "interrogated."